1
2
3
4
5
6
7
8

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
SPOKANE DIVISION

9

KYLE E. NORTH,

               Plaintiff

10

vs.

11

12

CITY OF PULLMAN POLICE
DEPARTMENT, DOUG ANDERSON, an
individual, MICHAEL SONTGERATH, an
individual, GARY JENKINS, an individual and
CHRISTIAN TENNANT, an individual.

13

14

15

               Defendants.

16

CASE NO.

COMPLAINT FOR DAMAGES
BASED UPON:

(1) VIOLATION OF 42 USC§1983
(2) NEGLIGENCE
(3) DISABILITY DISCRIMINATION
(4) OUTRAGE
(5) ASSAULT
(6) BATTERY

**DEMAND FOR JURY TRIAL**

17

    Comes now, KYLE NORTH, individually, and alleges as follows:

18

### **PARTIES**

19

20

    1.     Plaintiff KYLE NORTH ("North") is a citizen of the United States of America,

21

resides in the State of Washington and is a student at Washington State University.  During the

22

academic year, North resides in Pullman, Washington in Whitman County.  His permanent

23

residence is in Poulsbo, Washington in Kitsap County.

24

    2.     North suffers from Schizoaffective Disorder, a mental disability subject to the

25

protections of the Americans with Disabilities Act ("ADA") and the Washington Law Against

26

COMPLAINT FOR DAMAGES - 1

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

Discrimination ("WLAD").  North is a "qualified individual with a disability" under the ADA and WLAD.

3.      Defendant, CITY OF PULLMAN POLICE DEPARTMENT (hereinafter "PPD") is a municipal entity existing pursuant to and under the laws of the City of Pullman and the State of Washington.  The PPD conducts its operations in the City of Pullman, located in Whitman County, Washington.  The PPD is responsible for protecting the citizens of Pullman and upholding the laws of the State of Washington and the City of Pullman.  The PPD receives federal funds under federal programs and statutes, including the Crime Control Act of 1973.

4.      Defendant DOUGLAS ANDERSON (hereinafter "Officer Anderson") is a law enforcement officer employed by the PPD.  Officer Anderson  has a duty to protect and serve the individuals within the PPD's jurisdiction and to enforce the governing laws.  At all times alleged herein, Officer Anderson was acting within the course and scope of his employment with the PPD and under the color of law.  North is informed and believes that Officer Anderson resides in Whitman County Washington.

5.      Defendant MICHAEL SONTGERATH (hereinafter "Officer Sontgerath") is a law enforcement officer employed by the PPD.  Officer Sontgerath has a duty to protect and serve the individuals within the PPD's jurisdiction and to enforce the governing laws.  At all times alleged herein, Officer Sontgerath was acting within the course and scope of his employment with the PPD and under the color of law.  North is informed and believes that Officer Sontgerath resides in Whitman County Washington.

6.      Defendant GARY JENKINS (hereinafter "Chief Jenkins") is the PPD Chief of Police.  Chief Jenkins is responsible for planning, creating, implementing and enforcing all policies of the PPD.  Chief Jenkins is responsible for ensuring that all PPD officers receive

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:   11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

ongoing "use of force" training and is responsible to approving all instructors charged with

delivering use of force training.  Chief Jenkins is responsible for ensuring that all PPD officers

carry out their duties consistent with their training and in compliance with all PPD policies and

all governing laws.  Chief Jenkins is required to approve every instance in which an officer is

issued a taser gun.  North is informed and believes that Chief Jenkins resides in Whitman County

Washington.

7.     Defendant CHRISTIAN TENNANT ("hereinafter "Commander Tennant") is the

PPD Operations Commander.  Commander Tennant is responsible for investigating allegations

of police misconduct and recommending appropriate remedial and disciplinary action.

Commander Tennent is also responsible for managing PPD officer training and for ensuring that

PPD officers complete all required training and that the training received is effective.  As the

Operations Commander, Commander Tennant serves as the Acting Chief of Police in Chief

Jenkin's absence.  Commander Tennant reports directly to Chief Jenkins.  North is informed and

believes that Commander Tennant resides in Whitman County Washington.

8.     North is informed and believes and thereon alleges that the acts and omissions

alleged herein were carried out within the course and scope of the defendants' employment with

the PPD and pursuant to and consistent with a policy, custom and/or practice of the PPD,

including a policy of inaction.  The PPD, Chief Jenkins and Commander Tennant ratified the

conduct of each of the individual defendants named herein and all defendants acted with

deliberate and intentional indifference and/or willful disregard for the rights, safety and well-

being of North.

9.     North is informed and believes and thereon alleges that each defendant named in

this Complaint is the agent, servant and employee of the other defendants herein, and was at all

DEMAND FOR JURY TRIAL - 3

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:   11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

times acting within the course and scope of said agency and employment and with the consent and permission of each of the other co-defendants.

10.    The acts and omissions of Officer Anderson, Officer Sontgerath, Chief Jenkins and Commander Tennant, as alleged herein, were carried out for the benefit of their respective marital communities.

## JURISDICTION & VENUE

11.    This action arises under the Fourth Amendment to the United States Constitution, and other federal laws, including but not limited to the ADA.  This Court has original jurisdiction of this matter pursuant to 28 USC §§1331(federal question jurisdiction) and §1343 (federal civil rights jurisdiction).  This Court has supplemental jurisdiction pursuant to 28 USC §1367 to hear all related state law claims.  Venue is proper in this district pursuant to 28 USC §1391 because all the defendants reside in this judicial district.

12.    North provided the defendants with written notice of this claim on February 15, 2018 and has complied with all other requirements of RCW 4.92.110.

## FACTUAL ALLEGATIONS

13.    Local police serve the community to two separate roles - as law enforcement officers and as community caretakers.  These are two distinct functions and different types of training are required in order to ensure that police officers are able to safely and effectively carry out both roles.

## POLICE TRAINING

14.    With respect to the law enforcement function, officers are required to undergo ongoing training on the "use of force" so that they are able to safely and effectively respond to situations of suspected criminal activity.  When acting as in the capacity of a community

DEMAND FOR JURY TRIAL - 4

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:    11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

caretaker, officers are called upon in non-criminal situations for the purpose of providing health and/or safety assistance to citizens in need.  In order to safely and effectively aid a person with a mental health disorder, the law requires police officers to complete specialized training on mental health issues.  The eight-hour course, entitled Crisis Intervention Training ("CIT"), is conducted by the Washington State Criminal Justice Training Commission ("WSCJTC").

### Mental Health and Crisis Intervention Training

15.     There are two parts to the CIT curriculum.  The first part teaches law enforcement officers how to recognize the indicators of a mental health disorder.  The second part teaches the skills necessary to de-escalate a person in an excited state and maintain a calm, non-threatening environment until a mental health professional is able to take over with the needed care and services.

16.     Regarding the first objective, officers are not required to identify a particular diagnosis, nor is a diagnosis required or relevant.  Rather, the training identifies certain key behaviors that indicate the existence of a mental health disorder, irrespective of whether drugs or alcohol may also be involved.  Officers also learn that, although behaviors secondary to mental illness can be unsettling, they do not indicate a propensity for violence.  In fact, the training has been shown to increase empathy and tolerance for those with mental health disorders.

17.     Schizophrenia and Schizoaffective Disorder (referred to collectively as "Schizophrenia") is one of the most common mental health disorders that police officers encounter in the line of duty.  Behaviors secondary to Schizophrenia are easily recognized and include: 1) auditory hallucinations (hearing voices, including some that are hostile, threatening or accusatory); 2) delusions (experiencing irrational fear, paranoia or mistrust of others); 3)

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

disorganized thinking and speech (lack of coherence and/or mind going "blank"); and 4) muscle twitches (tremor or tic-like jerking of fingers, hands, limbs and/or facial muscles).

18.     The second part of CIT teaches officers how to responds once it is determined that a mental health issue is presented.  First and foremost, physical force is anathema to CIT.  In fact, research has shown that traditional law enforcement tactics, such as force, threats and shouting are not only ineffective, they often exacerbate the situation and greatly increase the risk of harm.  Rather, CIT instructs police officers that all interactions must be designed to de-escalate the situation so that the subject can obtain the needed treatment and services without suffering injuries.  The fundamentals tenets of CIT, include:

(a) Exercise Self Control: Remain calm and unemotional.  Don't raise your voice, shout or scream.  Seek to develop trust.

(b) Allow Physical Space:  Allow the subject significant personal space and avoid even non-confrontational physical contact.

(c) Actively Listen:  Gather information needed to obtain the necessary help and listen to answers provided.  Do not debate the "reality" of a delusion or hallucination.

(d) Do Not Make Demands:  Abandon the need to "win" on a debated point.  Do not insist on authoritative deference.  Do not demand behavioral compliance with standard commands such as "stand," "sit," or "turn around."

(e) Do Not Make Threats: Do not threaten the subject with punishment or consequence.

(f) Do Not Use Physical Force:  Do not use any type of physical force unless absolutely necessary to prevent imminent risk of serious harm.

DEMAND FOR JURY TRIAL - 6

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

(g) <u>Remain Patient</u>: Do not attempt to resolve the matter quickly.  A police response to a mental health crisis takes, on the average, three times as long to resolve as a response to a law enforcement call.

19.    Officers Anderson and Sontgerath completed the required CIT course on March 30 and 31, 2016, respectively.  As such, they were trained on the foregoing tenets and the standard of care applicable to the situation presented here and had actual knowledge of techniques required to safely intervene in a mental health crisis.

**Use of Force Training**

20.    Police officers are authorized to use various methods of force when carrying out law enforcement duties.  Included in these methods are a taser gun and a lateral vascular neck restraint ("LVNR").  Both methods require specialized training before they can be used in the line of duty.  In addition to technical skills, the PPD Policy and Procedures Manual (hereinafter "PPD Policy Manual") requires all officers to undergo specialized training designed to "enhance the member's discretion, judgment and skill in using use of force options."

***Taser Guns***

21.    In order to use a taser gun in the line of duty, all PPD officers are required to successfully complete a six-hour certification course.  The course curriculum is developed by Taser International (now Axon Enterprise, Inc.), the manufacturer of the taser guns used by the PPD.  Thereafter, all officers must complete an annual two-hour re-certification course and pass a functional two-cartridge deployment test.  Any officer who fails to complete and pass the annual re-certification training is not permitted to use a taser gun.  In fact, the PPD Policy Manual provides that an officer who fails successfully complete the re-certification training is not permitted to *carry* a taser and will not be issued one.

DEMAND FOR JURY TRIAL - 7

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:   11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

22.    Officer Anderson did not participate in taser re-certification training in 2015 or 2016 and was he not authorized to carry or use a taser at the time of the incident alleged herein.

### *Lateral Vascular Neck Restraint*

23.    LVNR is a force technique used to restrain a criminal suspect who is resisting arrest.  It works by reducing the circulation of blood to the brain until the suspect either stops resisting or loses consciousness.  The officer places his or her arm around the neck of the suspect and applies pressure to the carotid arteries on either side of the neck and then increases the pressure until the objective is achieved.  While LVNR is an effective law enforcement tool, it is extremely dangerous if not performed correctly.  As such, officers wanting to employ the technique must first complete an eight-hour training course developed by the National Law Enforcement Training Center.  As with taser training, the PPD Policy manual requires all PPD officers to successfully complete an annual recertification training course.  Officers who fail to complete that annual recertification training are not authorized to use LVNR.

24.    Officer Anderson did not undergo LVNR re-certification training in any year after 2013 and was not authorized to use LVNR at the time of the events alleged herein.

### ALLEGATIONS GIVING RISE TO CLAIM

25.    On the evening of August 17, 2016, North drove to Moscow, Idaho with friend and fellow student, Adrienne Fountain.  Over the course of the evening, Fountain noticed North exhibiting odd behavior.  As the evening progressed, North grew increasingly paranoid and expressed concern that he was being followed.  Around midnight, North told Fountain that he wanted to be alone and he drove off in his 2001 grey Lexus.  At that time, neither remembered that Fountain's wallet and phone was still in North's Lexus.

DEMAND FOR JURY TRIAL - 8

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:   11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

26.     Given North's odd behavior and concerned for his safety, Fountain contacted the Moscow Police Department and spoke with officer Joe Knickerbocker.  Fountain described North's strange behavior and that he feared people were tracking him by his cell phone. Knickerbocker asked if North was intoxicated or under the influence of drugs and Fountain confirmed that he was not.  Fountain also denied concern that North might harm himself.

**Pullman Police Conduct Welfare Check on North**

27.     The Moscow police issued a welfare check and contacted the Pullman Police Department for assistance.  Officer Sontgerath was on duty at the time and responded to the request by searching for North's Lexus around NE Lower Drive in Pullman.  Unable to find North or his Lexus, Officer Sontgerath deemed the matter closed.

28.     At 3:12am on the morning of August 18, 2016, North walked into the Jack in the Box restaurant on NE Stadium Way in Pullman (hereinafter "JIB") and approached the night manager, Olin Braun.  Braun noted that North looked scared.  North told Braun that he feared people were following him with the intent to do harm and that he needed police protection. Braun gave North a paper cup for the water dispenser and tried to assure North that no one was following him.  Hesitant to get the police involved, Braun asked North if he was sure that he wanted police assistance.  North insisted, stating that he would feel better if he could sit down and talk with a police officer.  Braun called 911 as requested.

*Officers Anderson and Sontgerath Arrive at JIB*

29.     Officer Sontgerath and Officer Anderson arrived at JIB approximately ten minutes later in separate squad cars.  Both were wearing police body cams that captured the

DEMAND FOR JURY TRIAL - 9

Law Offices of Brian H. Krikorian PLLC
Mailing:  P.O. Box 6905
Bellevue, Washington 98008
Telephone:  (206) 596-2220

Office:  11900 N.E. 1st Street, Suite 300, Building G
Bellevue, Washington 98005

events that followed, on video and audio.  The events were also captured on JIB's surveillance system which is comprised of four cameras positioned throughout the restaurant.

30.    Upon entering the restaurant, both officers knew that North was the subject of the earlier welfare check issued by the Moscow Police Department.  In addition, both witnessed North exhibiting obvious and objective indications of a significant mental health disorder.  In a disjointed and confusing narrative, North stated that Fountain was missing and that he needed their help to find her.  He also stated that he was concerned for his safety and for Fountain's safety.  North stated that he was not feeling well and that everything was a "blur."  Throughout this time, North was rapidly rotating his right-hand, side to side, in quick short motions, while snapping his right-hand fingers.

31.    While talking with the officers, North discovered Fountain's wallet and phone in his pocket.  He grew visibly alarmed and confused and told the officers that he was "freaking out."  During this time Officers Sontgerath and Anderson confirmed that Fountain was not missing and not in danger but, rather, was the person who requested the welfare check hours earlier.  Officer Sontgerath searched North's person and did not find any weapons, alcohol or illegal drugs.

32.    Despite North's concern for Fountain, the officers made no effort to assure North that Fountain was safe.  North asked Officer Sontgerath if the two could sit down and talk. Officer Sontgerath refused.

### Plan to go to the Hospital

33.    Officer Sontgerath asked North if he wanted to go to the hospital where he could talk with a mental health professional.  North said that he did, provided that Officer Sontgerath

DEMAND FOR JURY TRIAL - 10

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

would escort him there.  Officer Sontgerath agreed.  After confirming that North was not under the influence of alcohol or drugs, a plan was reached whereby Officer Sontgerath would drive his squad car to the hospital and North would follow directly behind in his Lexus.

34.     As this discussion was happening, North was overcome by an auditory hallucination.  In response to voices that appeared to be coming from his left side, North uttered the following words:

> **North:** "Oh!  Oh!  Oh my God!  Uh. . .  Wow. . .  Oh my Go. . . . Oh!  Oh!
> Oh!  This is happening."

35.     Officer Sontgerath witnessed the hallucination and responded: "What Kyle?" North continued conversing with the voice to his left and then turned back to Officer Sontgerath and the two exchanged the following words:

> **North**: "I need. . .  I need help."

> **Officer Sontgerath**: "I know, that is why we are going to the hospital."

> **North**: "Thank you for helping me."

36.     North stood up and moved toward the door.  Remained convinced that there were people outside that wanted to hurt him, North asked Officer Sontgerath to go out the door first. This would have positioned North safely between two police officers as he moved through the parking lot and to his Lexus.  Officer Sontgerath refused, stating: "Nope.  I'm walking behind you.  You are not walking behind me."

37.     Visibly alarmed and confused, North began to walk backward, away from the officers, and stated: "But I'm following you there?"  By this time, thirteen minutes had passed since Officer Sontgerath arrived at JIB and he was running out of patience.  In an annoyed tone, Officer Sontgerath responded: "I'm not here to play games, Kyle."

DEMAND FOR JURY TRIAL - 11

**LAW OFFICES OF BRIAN H. KRIKORIAN** PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:   11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

38.    The tone and content of Officer Sontgerath's words were sufficient to obliterate any trust that may have developed, and North moved away from the exit door and back to the area next to the service counter where he previously waited for the officers' arrival.

39.    Contrary to the basic tenets of the crisis intervention training that the officers received only five months earlier, Officers Sontgerath and Anderson *yelled* at North and *threatened him with arrest* if he walked behind the customer counter.  North assured the officers that he did not intend to go behind the customer counter but simply wanted to remain standing against the wall next to the counter.  Although North was not accused of any criminal activity and although no one at JIB had requested North's removal, the officers *demanded* that North leave the restaurant so that JIB could "run a business."

40.    Without any probable cause to detain North, Officer Sontgerath advised North that if he did not agree to leave voluntarily, the officers would take him involuntarily.  North was visibly stunned as he tried to process how his call for police help went so terribly wrong.  He turned to the JIB employees and, with a nervous and perplexed tone, said: "What are they trying to do to me?"

41.    North then turned back to the officers and, with his hands clasped together in a "pretty please" gesture, said that he wanted to call his parents.  North was then overcome by another auditory hallucination.  This time, the voices appeared to be coming from both his left and right sides.  North quickly regained his composure and said: "I just want a drink of water."

### Unconstitutional Force and Seizure

42.    As North started toward the water dispenser, Officer Sontgerath grabbed North by both wrists, pushed him back against the wall next to the customer counter.  In a threatening and authoritative tone said: "Don't you. . . ."  In response, North pleaded: "Please don't."  Officer

DEMAND FOR JURY TRIAL - 12

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

Songerath responded: "If you fight me, you are going to get hurt." Clearly terrified, North

responded: "Yes sir."

43.    Officer Songerath then grabbed North's right arm and Officer Anderson grabbed

North's left arm. North offered no resistance. Officer Songerath repeated his prior warning and

told North: "You are going to get hurt." Both officers then pulled North's arms behind his back

as they pushed him to his knees and then face-down on the floor. North did not resist in any

way, physically or verbally. Then, in a calm and bone-chilling voice, Officer Songerath

informed North:

> **Officer Songerath**: "You *are* going to get hurt, buddy."

44.    Seconds after Officer Songerath uttered his threat, North screamed out in pain as

Officer Songerath broke North's right arm at the medial and lateral epicondyles and dislocated

his elbow. The force used to inflict the injury was so great that it ripped the collateral and

annular ligaments completely off the bones underneath. In excruciating pain, North screamed

out for help:

> **North:** "He broke my arm! He broke my arm! Help me! God help me!
> Don't let them do this."

45.    Officer Songerath did not acknowledge the injury he inflicted, dismissed the

pleas for help and proceeded to place North in handcuffs. Officer Songerath informed North

that he was in "protective custody," that he was going to the hospital and that he would be

expected to "cooperate." By then North had fallen silent.

46.    Due to the magnitude of the ligament tears, North was developing

rhabdomyolysis - a serious condition in which damaged skeletal muscles rapidly break down

and release myoglobin into the blood stream. Officer Songerath showed no concern for North's

DEMAND FOR JURY TRIAL - 13

**Law Offices of Brian H. Krikorian** PLLC
**Mailing:** P.O. Box 6905
Bellevue, Washington 98008
Telephone: (206) 596-2220

**Office:** 11900 N.E. 1st Street, Suite 300, Building G
Bellevue, Washington 98005

welfare but, rather, demanded that he acknowledge and defer to Officer Songerath's authority and to do exactly as instructed:

> **Officer Songerath**: "Do you hear me?"
>
> **North**: [no audible response]
>
> **Officer Songerath**: "If you continue to be a problem you are going to get dropped on your ass again, do you understand that?"
>
> **North** [faintly audible]: "Yes sir."

47.    At this point, North was reasonably terrified of these officers.  Officer Songerath sadistically informed North that he was going to hurt him, and he did – despite North's total non-resistance.  North needed emergency medical attention.  The officers did not indicate that they would seek medical help.  To the contrary, they threatened to "drop him on his ass."  North had no idea what the officers might do next, let alone where they might be taking him.

48.    The officers pulled North to his feet and ordered him to walk toward the side door of the restaurant.  As they passed the office, North hooked his leg inside the office door and fell to the ground, with his upper torso in the office and his right leg extended out to the customer counter and shouted out:

> **North:** "Don't let them take me!  Please!  Call somebody!  All of you!  Hey! No! No!  No! Hey! Somebody stop them!  Somebody stop them!  Somebody!"

49.    Officer Songerath asked one of the JIB employees to call the paramedics stating that North would need to be transported to the hospital.  With North face down on the floor and his hands cuffed behind him, Anderson pressed down on North's injured right arm.  As North screamed out in pain, Anderson shouted:

DEMAND FOR JURY TRIAL - 14

**Law Offices of Brian H. Krikorian PLLC**
**Mailing:**  P.O. Box 6905
Bellevue, Washington 98008
Telephone:  (206) 596-2220

**Office:**  11900 N.E. 1st Street, Suite 300, Building G
Bellevue, Washington 98005

**Anderson:**  "You're gonna get tased in a second.  Knock it off!"

50.    North then began to pray quietly.  Anderson continued shouting at North and demanded that he straighten out his legs. Officer Sontgerath responded stating: "he's not going anywhere."

### **Officers Tase and Choke North While he is Handcuffed**

51.    North remained still and face down on the floor, praying.  He prayed for the officers and their families and asked that God forgive them "for they know not what they do." He prayed that the officers would "see the light" and "feel God's love" and that God would "cast out all evil."  In an annoyed and indignant tone, Officer Anderson told North:

**Anderson:** "You should pray for yourself."

52.    While waiting for the paramedics to arrive, North remained handcuffed and face-down on the office floor, praying quietly.  After about six minutes passed, the officers decided that they would remove North from the office before he would receive medical aid.  Officer Sontgerath grabbed North's right leg and Officer Anderson grabbed North's right broken arm and they attempted to drag North across the floor, out of the office.  North screamed out in pain and pushed off the office wall with his left leg.  North ended up under the desk with his head between a metal rack and a filing cabinet.

53.    Officer Anderson grabbed North by the right arm and attempted to lift him to a standing position with the entirety of North's body weight being raised by the fractured and dislocated arm.  North screamed out in pain.  Officer Anderson then flew into a rage.  He removed his taser from his belt and tased North three times in rapid succession while screaming:

**Anderson:** "Get out!  Get out!  Get out!"

DEMAND FOR JURY TRIAL - 15

**Law Offices of Brian H. Krikorian** **PLLC**
**Mailing:**  P.O. Box 6905
Bellevue, Washington 98008
Telephone:  (206) 596-2220

**Office:**  11900 N.E. 1st Street, Suite 300, Building G
Bellevue, Washington 98005

54.     The taser report reveals that Officer Anderson dispensed 16 seconds of electrical current into North's body over a period of 21 seconds.  North pleaded: "I repent, I repent, I repent." Officer Anderson then pressed the side of North's face into the floor and stated:

**Anderson:** "I'm gonna put you out."

North pleaded for mercy uttering:

**North:** "Yes sir.  I'm going.  I'm going. You have my word.  You have my word.  You have my word.  Oh, please.  Please help!"

55.     As North was pleading for help, Officer Anderson placed his left arm around North's neck in a lateral vascular neck restraint and, by the neck, pulled North's body to a standing position while screaming at North to "get up."

56.     Officer Anderson continued pulling back on North's neck until his feet were no longer flat on the floor and his body weight was suspended entirely by Anderson's arm around North's neck.  North uttered "help me" and moaned faintly before falling silent.  Officer Anderson asked Officer Sontgerath if North was "out."  Officer Sontgerath confirmed and they lowered North to floor.

57.     While North was unconscious on the floor, Officer Sontgerath pulled North by the left arm to the area just outside the office.  Officer Anderson stood behind North and, with his feet, pushed North across the tile floor.  North remained unconscious for 22 seconds.  Upon waking, North saw the paramedics surrounding him and said:  "Oh! My God! Men, can you help me?"

**North Receives Medical Aid**

58.     The paramedics administered Ketamine and had Officer Sontgerath remove the handcuffs.  North was then placed on a gurney and taken to the Emergency Room at Pullman

DEMAND FOR JURY TRIAL - 16

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

Regional Hospital ("PRH").  In addition to the arm injury, North had abrasions his head, back, shoulders, neck, chest, lower lip and knees as well as bruising.

59.     The attending physician, Dr. Larry Brown, asked Officer Sontgerath to explain how the injuries happened.  Officer Sontgerath admitted that he took North's right arm, put it behind his back and "reamed on it."  In an attempt to justify the degree of force used, Officer Sontgerath said that North was combative and that the officers had "no choice" if they wanted to return home safely to their families.  Officer Sontgerath did not advise Dr. Brown that, subsequent to the fracture sustained at the time of cuffing, the officers repeatedly pulled on North's right arm and pressed down on his right shoulder.  Nor did the officers advise Dr. Brown that, subsequent to the arm fracture, and after restraining North with handcuffs, they tased him three times and choked him into unconsciousness.

60.     Regarding the cuts and bruises on North's body, Officer Sontgerath conceded that some were from the altercation at JIB but claimed that others pre-existed the altercation.  North did not have any injuries or abrasions when he arrived at JIB

61.     North was diagnosed with:1) acute psychosis with agitation; 2) a right elbow fracture; 3) a right elbow dislocation; and 4) rhabdomyolysis.  PRH records state that the elbow fracture was "secondary to trauma from police intervention for combativeness."

62.     Both Officer Anderson and Officer Sontgerath completed a post-incident "Use of Force Report."  Commander Chris Tennant and Chief Jenkins reviewed both reports as well as both body cam videos.  Despite this review, no corrective action was taken against either officer and no further investigation was conducted.  Anderson's taser was not confiscated and the taser log reveals that he continued to actively use it, despite his lack of certification.  Remarkably,

DEMAND FOR JURY TRIAL - 17

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:   11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

1    Commander Tennant's report states that the incident was ***not*** crisis intervention related and,

2    contrary to all evidence, indicates that North was under the influence of intoxicants.

3        63.    After being released from the hospital, North withdrew from Washington State

4    University and returned home to Poulsbo, Washington where he underwent surgery on his arm.

5    While North has regained the use of his arm, the force of the injury resulted in a permanent

6    reduction in his range of motion.  As a result of the extensive cartilage damage, the functioning

7    in North's elbow is permanently compromised and will remain highly susceptible to further

8    injury, pain and reduced functioning.

9

10       64.    As a result of the conduct of the defendants, North has suffered and will continue

11   to suffer emotional and mental injury and distress and permanent physical injury.

12                          **FIRST CLAIM FOR RELIEF**
13              **Violation of 42 USC § 1983: The Fourth Amendment**

14       65.    Plaintiff repeats, re-alleges and incorporates herein by reference the allegations of

15   paragraphs 1 through 64, as though set forth at length.

16       66.    The Fourth Amendment to the United States Constitution guarantees North the

17   right to be free from unreasonable seizures of his person.  An arrest without probable cause

18   violates the protections of the Fourth Amendment.

19

20       67.    Police officers are permitted to take a mentally ill person into protective custody

21   and to use force upon such person only when there is reasonable cause to belief that the mentally

22   ill person presents imminent risk of harm to himself or others.  RCW 71.05.153, RCW

23   9A.16.020(6) and RCW 9A.16.040.  Without objective evidence of such a risk, police have no

24   right to detain the mentally ill person.

25

26

DEMAND FOR JURY TRIAL - 18

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

68.     North was not accused of any criminal activity nor was he the subject of any civil complaint.  There was no evidence that North presented any risk of harm to himself or others, let alone an "imminent risk of serious harm."  North made no threatening comments or gestures and did not have a weapon.  Because Officers Anderson and Sontgerath had no grounds to take North into custody, the seizure of his person was in violation of the Fourth Amendment.

69.     In addition to the wrongful seizure of North's person, Officers Anderson and Sontgerath violated North's Fourth Amendment right to be free from unreasonable seizures and excessive force.  In order to be reasonable, each use of force must be separately justified with a legitimate government interest.

70.     By 3:40am, North was handcuffed and face down on the floor of the JIB office.  The force used to accomplish the arm injury was so severe that rhabdomyolysis was setting in and North was growing increasingly sick.  The police audio recording captures Officer Sontgerath conceding "he isn't going anywhere."  Stated otherwise, North was completely incapacitated.  There was absolutely no risk that he could harm himself or others.  He certainly could no flee.  Despite being incapacitated and fully restrained, Officer Anderson tased North three times in rapid succession, pulled him to a standing position by his neck and choked him into unconsciousness.  Officer Anderson used additional force by repeatedly pulling and pressing on North's injured right arm.  There were no governmental interests served in connection with this force and its use was a violation of North's Fourth Amendment rights.

71.     The defendants further violated North's Fourth Amendment rights by:

a)  Subjecting him to force exercised by an untrained officer not qualified or authorized to employ the force methods used;

DEMAND FOR JURY TRIAL - 19

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

b)   Subjecting North to unsafe levels of taser current contrary to the safety
guidelines set forth in the training materials and all governing standards;

c)   Failing to implement the crisis intervention and de-escalation techniques
taught during the March 2016 CIT course; and

d)   Continuing to subject North to unnecessary and excessive force, even after
medics were on the scene and despite North's repeated pleas for medical aid.

72.    Chief Jenkins and Commander Tennant are responsible for ensuring that all PPD officers are properly trained and that they carry out their duties consistent with such training and in compliance with the law and PPD policies.

73.    Chief Jenkins is responsible for approving all instances in which an officer is issued a taser gun.  Chief Jenkins and Commander Tennant knew that Officer Anderson had not completed the required re-certification training that was a prerequisite for the issuance of a taser. Despite this knowledge the PDD issued Officer Anderson a taser gun and permitted him to use it in the line of duty.

74.    Anytime an officer uses a taser, electronic data from the taser gun is automatically downloaded to an evidence database.  This evidence log reveals that Officer Anderson used his taser gun on other victims before and after the incident involving North.  As such, Chief Jenkins and Commander Tennant were on notice prior to August 18, 2016 that Officer Anderson was using a taser in violation of PDD policy and the manufacturers training requirements.

75.    Chief Jenkins and Commander Tennant were also aware that, in the 18 months prior to the North incident, Officer Anderson failed to attend numerous other scheduled training sessions.  In addition to his failure to attend the taser re-certification course, Officer Anderson failed to attend "Less Lethal Considerations," "Responding to People with Alzheimer's" and

DEMAND FOR JURY TRIAL - 20

**LAW OFFICES OF BRIAN H. KRIKORIAN** <sup>PLLC</sup>
**MAILING:**  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

**OFFICE:**  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

"Defensive Tactics."  Chief Jenkins and Commander Tennant were also aware that Officer

Anderson had not received LVNR re-certification training in any year since 2013.

76.     Prior to August 18, 2016, Chief Jenkins and Commander Tennant were aware  of

numerous citizen complaints regarding Anderson's combative temperament and his disregard for

the rights of the very citizens that he is charged with protecting.  Many of the complaints arise

out of allegations of a hair-trigger temper in which Officer Anderson threatens, berates and/or

belittles a citizen.  Despite investigations that revealed the merits of these complaints, the PDD

took no corrective action.  Nor did the PDD act to ensure that Officer Anderson was mentally

and emotionally capable of carrying out his duties consistent with the constitutional rights of

citizens and in conformity with police training.

77.     Chief Jenkins and Commander Tennant are responsible for supervising Officer

Anderson and Officer Sontgerath.  They knew that Officer Anderson had not completed taser re-

certification training but issued him a taser anyway. They knew that Officer Anderson was using

his taser gun in an abusive and dangerous manner but failed to confiscate it.  They knew that

Officer Anderson failed to engage in other use of force training necessary to ensure that he

carried out his duties in a safe manner.  They knew that Officer Anderson presented a risk of

harm and was not qualified to respond to a welfare check.  Nonetheless, the PDD dispatched

Anderson to respond on August 18, 2016.  Such conduct constitutes an intentional, willful,

reckless and careless disregard for North's safety and wellbeing.

78.     The conduct alleged herein is part of a longstanding PPD policy, practice or

custom and was ratified by Chief Jenkins and Commander Tennant.  All defendants acted with a

reckless or callous indifference to the rights and well-being of North.

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:   11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26

79.      North is informed and believes that no disciplinary or corrective action has been taken against any officer in connection with the events of August 18, 2016.  North is informed and believes that no meaningful investigation was conducted into the incident alleged herein and that no action has been taken to prevent a recurrence of these events in the future.

80.      North is informed and believes that no action has been taken to ensure that Officer Anderson is mentally and emotionally capable of responding a situation involving a mental health crisis.  The PDD did not confiscate Anderson's taser gun and he continued to use it on other citizens after August 18, 2016, despite his lack of re-certification training.

81.      North's constitutional right to be free from the wrongful seizure and excessive force is well-established and any reasonable police officer would recognize it as such.  It is beyond legitimate debate that a person who is not suspected of criminal activity and who does not present an imminent risk of harm has a constitutional right to be free from police custody and police force.  Regarding taser force, the law is well-established that a mentally ill person has the right to be free from taser force unless there are objective indicators that such person presents a serious risk of imminent harm.  This right was clearly articulated in the 2009 Ninth Circuit seminal decision in *Bryan v. MacPherson,* 590 F.3d 767 (9th Cir. 2009).  The rule in *Bryan* is now so well established that the Taser International recertification course materials declare it to be ***definitively unlawful*** to use a taser on a mentally ill person who does not present an imminent risk of harm.

82.      All defendants herein were aware that North had the foregoing well-established rights.  In fact, in 2010 the PPD dedicated an entire training session on the holding in *Bryan.* Officers Anderson and Sontgerath attended the training.  Commander Tennant was the instructor.

DEMAND FOR JURY TRIAL - 22

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:   11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

83.      As a direct and proximate result of this conduct, North has suffered and continues to suffer severe emotional distress, mental anguish and permanent physical injury.

**SECOND CLAIM FOR RELIEF**
**Negligence**

84.      Plaintiff repeats, re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 64 and 66 through 83, inclusive, as though set forth at length.

85.      The defendants had a duty to defend and protect North and to act in compliance with the governing standard of care, all police training, the PPD Policy Manual, the governing law and the federal and state constitutions.  The defendants breached their duty by failing to act in compliance with the governing standard, training, polices and laws as set forth herein.

**<u>Failure to Implement CIT</u>**

86.      Although only five months had passed since the officers underwent crisis intervention training, they failed and refused to implement even the most basic aspects of the training, including but not limited to:

    a)  Using physical force to wrongfully take North into custody.

    b)  Refusing to sit down and talk with North, despite his repeated request.

    c)  Refusing to allow North to walk between the officers through the parking lot on his way to the car.

    d)  Screaming at North and threatening him with arrest, involuntary custody, and physical harm.

    e)  Failing to bring about a sense of calm and trust, but, rather, dramatically escalating the crisis.

DEMAND FOR JURY TRIAL - 23

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:   11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

f) Failing to make a phone available to North when he expressed the desire to call his parents.

g) Failing to provide North with reassuring information regarding Fountain's safety.

**h)** Subjecting North to taser and LVNR force even after the paramedics had arrived and were capable of taking over.

87.    Rather than showing North compassion and support, the officers mocked him for exhibiting disability related behaviors.  As a result of involuntary jerking arm movements, North spilled water from the cup in his hand.  Officer Anderson chastised North for "throwing water all over the floor."  During this time, North was in a heighted paranoid state consistent with a schizophrenic episode and became anxious when Officer Sontgerath started writing a number on his arm.  North asked why he was writing on his skin.  Officer Anderson responded: "He is a grown man.  He can do whatever he wants."  North also became alarmed when he noticed that Officer Sontgerath was wearing gloves and asked why.  In a dismissive and belittling tone, Officer Anderson stated: "He has been wearing them since we got here."

88.    Prior to the officers' arrival, North was talking with the JIB employees and mentioned that used to work at a JIB restaurant near his home in Poulsbo.  After the officers broke his arm, North screamed out to the JIB employees for help, stating "I'm one of you."  Officer Anderson dismissed the veracity of the claim and curtly declared: "you don't work here."

89.    After the arm fracture and while North was laying handcuffed on the floor, he began to pray.  At one point, he prayed that the officers be forgiven.  Officer Anderson responded with "we haven't done anything wrong.  You should pray for yourself." As North continued to pray, Officer Anderson demanded that North stop his "babbling."  While in the

DEMAND FOR JURY TRIAL - 24

Law Offices of Brian H. Krikorian PLLC
Mailing:  P.O. Box 6905
Bellevue, Washington 98008
Telephone:  (206) 596-2220

Office:  11900 N.E. 1st Street, Suite 300, Building G
Bellevue, Washington 98005

parking lot and with North in the ambulance a few feet away, Officer Anderson laughed about North's praying.  He further stated that it is *North* who has the "inner demons."

90.    The PPD, Chief Jenkins and Commander Tennant breach their duty of care in that they:  1) issued a taser gun to Officer Anderson knowing that he was not trained or qualified to use it; 2) permitted Officer Anderson to respond to calls requiring crisis intervention skills knowing that he was unwilling or unable to safely perform in such circumstances; and 3) failed to ensure that Officers Anderson and Sontgerath carried out their duties consistent with their police training.

**Misrepresentation Regarding Facts**

91.    Police officers have a duty to accurately report facts surrounding an incident.  The defendants here not only failed to accurately report the facts, they affirmatively misrepresented them.

92.    Officers Anderson and Sontgerath advised dispatch, the medics and the medical providers at PRH that North was under the influence of drugs.  Both knew that North was not under the influence and that their statements were untrue.  Fountain denied that North had taken drugs.  A search of North's car and person did not produce drugs or evidence thereof.  Officer Sontgerath was completely comfortable allowing North to drive himself to the hospital.  Indeed his written report reveals that repeatedly confirmed that North was safe to drive.  Although the record is completely devoid of any drug use, Commander Tennant's report of the incident also claims that drugs were involved.  Remarkably, Commander Tennant's report also states that the incident did not require a crisis intervention.

93.    The officers also misrepresented facts regarding North's behavior in an attempt to justify their unconstitutional use of force.  Specifically, the officers claim that North resisted the

DEMAND FOR JURY TRIAL - 25

Law Offices of Brian H. Krikorian PLLC
Mailing:  P.O. Box 6905
Bellevue, Washington 98008
Telephone:  (206) 596-2220

Office:  11900 N.E. 1st Street, Suite 300, Building G
Bellevue, Washington 98005

Officer Anderson's efforts to place him in handcuffs, that he was combative and slammed Officer Anderson against the office door. The videotapes of the incident prove these statements to be completely untrue.

94.    The defendants also mispresented the nature of North's injuries as "minor." In his written report, Officer Sontgerath states that Dr. Brown "later" advised that North's arm "appeared" to have been dislocated. However, the audio recording in the ER reveals that Dr. Brown advised Officer Sontgerath that North suffered a fractured arm, a dislocated elbow and that the surrounding ligaments had been damaged.

95.    In addition to their general duty of care, a special relationship existed between North and the defendants once the defendants responded to North's request for assistance. Once the defendants responded to North's call for help, a duty arose to exercise reasonable care when rendering aid and assistance and to duty refrain from conduct that would create or increases the risk of harm. The conduct of the defendants as alleged herein, affirmative created the dangerous situation that resulted in North's injuries.

96.    As a direct and proximate result of this conduct, North has suffered and continues to suffer severe emotional distress, mental anguish and permanent physical injury.

### THIRD CLAIM FOR RELIEF
### Disability Discrimination

DEMAND FOR JURY TRIAL - 26

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

97.     Plaintiff repeats, re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 64, 66 through 83, and 85 through 96 inclusive, as though set forth at length.

98.     The ADA and the WLAD guarantee citizens the right to the full enjoyment of all accommodations, advantages, facilities and privileges of law enforcement safety services without discrimination.  North was not only denied the privileges of law enforcement safety services, he was affirmatively harmed.

99.     Officer Anderson and Officer Sontgerath subjected North to excessive force and seized his person as a direct result of behavior that was the result of his disability.  Just prior to the arm fracture, Officer Sontgerath advised North that he was going to be the subjected to police force if he continued to "act this way."  Officer Anderson told North that he was going to get tased if he did not stop "babbling."  Both officers threatened to tase North if he refused to "cooperate."  Consistent with such threat, North was tased three times.

100.     As a direct and proximate result of this conduct, North has suffered and continues to suffer severe emotional distress, mental anguish and permanent physical injury.

### FOURTH CLAIM FOR RELIEF
### Outrage

101.     Plaintiff repeats, re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 64, 66 through 83, 85 through 96 and 98 through 100, inclusive, as though set forth at length.

102.     The acts and omissions of the Defendants, as alleged herein, are so outrageous, atrocious and extreme that they go beyond all possible bounds of decency and are utterly

DEMAND FOR JURY TRIAL - 27

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

intolerable in a civilized community.  These acts were carried out intentionally and/or recklessly with a reckless indifference for the foreseeable emotion harm.

103.    As a direct and proximate result of this conduct, North has suffered and continues to suffer severe emotional distress, mental anguish and permanent physical injury.

### FIFTH CLAIM FOR RELIEF
### Battery

104.    Plaintiff repeats, re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 64, 66 through 83, 85 through 96, 98 through 100, and 102 through 103, inclusive, as though set forth at length.

105.    The force alleged herein constitutes harmful and/or offensive contact that was carried out with the intent to bring about the harmful and/or offensive conduct.

106.    As a direct and proximate result of this conduct, North has suffered and continues to suffer severe emotional distress, mental anguish and permanent physical injury.

### SIXTH CLAIM FOR RELIEF
### Assault

107.    Plaintiff repeats, re-alleges and incorporates herein by reference the allegations of paragraphs 1 through 64, 66 through 83, 85 through 96, 98 through 100, 102 through 103 and 105 through 106, inclusive, as though set forth at length.

108.    Officer Anderson and Officer Sontgerath committed acts that were designed and intended to cause North to fear or apprehend immediate harmful and/or offensive contact.  North felt and experienced such fear and apprehension.

109.    As a direct and proximate result of this conduct, North has suffered and continues to suffer severe emotional distress, mental anguish and physical injury.

### PRAYER FOR RELIEF

DEMAND FOR JURY TRIAL - 28

Law Offices of Brian H. Krikorian PLLC
Mailing:  P.O. Box 6905
Bellevue, Washington 98008
Telephone:  (206) 596-2220

Office:  11900 N.E. 1st Street, Suite 300, Building G
Bellevue, Washington 98005

WHEREFORE, North seek judgment and prays for relief against the defendants, as follows:

1)      Special damages according to proof;

2)      General damages for pain, suffering, emotional distress, anguish and humiliation, according to proof;

3)      Punitive damages as against Doug Anderson, Mike Officer Sontgerath, Gary Jenkins and Christian Tennant;

4)      Attorneys' fees, costs and expert witness fees pursuant to statute, including but not limited to 29 USC §§ 794a; 42 USC §§ 1988, 12203, 12205 and 2000a-3; and RCW 49.60.030; and

5)      All other relief that this court may deem just and proper.

Dated: August 15, 2018            LAW OFFICES OF BRIAN H. KRIKORIAN PLLC

By /s Brian H. Krikorian WSBA #27861
Ridgewood Corporate Square
11900 N.E. 1st Street, Suite 300, Building G
Bellevue, Washington 98005
Telephone: 206-596-2220
Fax: 206-629-9419
bhkrik@bhklaw.com

Co-Attorney for Plaintiff

DEMAND FOR JURY TRIAL - 29

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING: P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone: (206) 596-2220

OFFICE: 11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005

Dated:  August 15, 2018                CREER LEGAL

By /s/ _____

ERICA A. KRIKORIAN, WSBA #28793
(Admission to the Eastern District Pending)
11900 NE First Street, Suite 300-G
Bellevue, WA 98005
(425) 404-2399
erica@creerlegal.com
Co-Attorney for Plaintiff


### Jury Demand

North hereby demands a trial by Jury, pursuant to FRCP 38, as to all issues so triable.


Dated: August 15, 2018                LAW OFFICES OF BRIAN H. KRIKORIAN PLLC

By /s Brian H. Krikorian WSBA #27861
Ridgewood Corporate Square
11900 N.E. 1st Street, Suite 300, Building G
Bellevue, Washington 98005
Telephone: 206-596-2220
Fax: 206-629-9419
bhkrik@bhklaw.com

Co-Attorney for Plaintiff

LAW OFFICES OF BRIAN H. KRIKORIAN PLLC
MAILING:  P.O. BOX 6905
BELLEVUE, WASHINGTON 98008
Telephone:  (206) 596-2220

OFFICE:  11900 N.E. 1ST STREET, SUITE 300, BUILDING G
BELLEVUE, WASHINGTON 98005